IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 27, 2017

## STATE OF TENNESSEE v. ZACHARY EVERETT DAVIS

**Appeal from the Criminal Court for Sumner County**
**No. 754-2014      Dee David Gay, Judge**

_____

### No. M2016-01579-CCA-R3-CD

_____


When he was fifteen years old, the Defendant, Zachary Everett Davis, killed his mother by hitting her in the head with a sledgehammer numerous times and attempted to kill his brother by setting the family's residence on fire. After determining that the Defendant was competent to stand trial, the juvenile court transferred the Defendant's case to the Sumner County Criminal Court. The Sumner County Grand Jury indicted the Defendant on charges of first degree premeditated murder, attempted first degree premeditated murder, and aggravated arson. After a competency hearing, the trial court determined that the Defendant was competent to stand trial. After a suppression hearing, the trial court concluded that the Defendant knowingly and voluntarily waived his rights prior to an interview conducted by the Sumner County Sheriff's Office. A Sumner County jury found the Defendant guilty as charged, and the trial court ordered the Defendant to serve a life sentence for his first degree murder conviction. After a sentencing hearing, the trial court ordered the Defendant to serve twenty years with a thirty percent release eligibility for attempted first degree murder and twenty years with a 100% release eligibility for aggravated arson; the trial court ordered the twenty-year sentences to run concurrently with each other but consecutively to the Defendant's life sentence. On appeal, the Defendant argues that the trial court erred in: (1) denying the Defendant's motions to be declared incompetent; (2) denying the Defendant's motion to suppress his statement to the Sumner County Sheriff's Office; (3) denying the Defendant's motion for mistrial after the Defendant testified on direct and cross-examination that he did not commit the offense; and (4) sentencing the Defendant to a de facto sentence of life without parole in violation of the Eighth Amendment of the United States Constitution. After a thorough review of the record and applicable case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined. D. KELLY THOMAS, JR., J., filed a separate concurring opinion, in which CAMILLE R. MCMULLEN, J., joined.

Randy P. Lucas, Gallatin, Tennessee, for the appellant, Zachary Everett Davis.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Tara A. Wyllie, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**

On the evening of August 10, 2012, the Defendant hit his mother in the head with a sledgehammer approximately eight to fifteen times, lit a fire in his residence's "game room," and left his residence with his deceased mother and his older brother still inside. In the early morning hours of August 11, 2012, the Sumner County Sheriff's Office apprehended the Defendant and took him into custody. After being informed of his rights, the Defendant confessed to killing his mother and setting his residence on fire by using whiskey as an accelerant. On August 13, 2012, the State filed a petition with the juvenile court charging the Defendant with first degree murder, attempted first degree murder, and aggravated arson and filed a petition to transfer the Defendant's case to the Sumner County Criminal Court. On August 14, 2012, the Defendant filed a motion requesting a forensic evaluation, which the juvenile court ordered. On September 11, 2012, the juvenile court held a hearing on the Defendant's competency and determined that the Defendant was competent. On September 18, 2012, the juvenile court conducted a transfer hearing and transferred the Defendant's case to the Sumner County Criminal Court. The Sumner County Grand Jury indicted the Defendant for first degree premeditated murder, attempted first degree premeditated murder, and aggravated arson on October 4, 2012.

*Competency Hearing*

During a competency hearing conducted January 13, 2014, Dr. Sandra Phillips testified that she worked as the forensic services coordinator for Volunteer Behavioral Health, where she evaluated defendants to determine whether they are competent to stand trial and whether they qualified for an insanity or diminished capacity defense. She

explained that, if she cannot make a determination, then she "recommend[s] an inpatient evaluation at one of the regional mental health institutes." After the trial court declared Dr. Phillips an expert in forensic psychology, she testified that she evaluated the Defendant several times, first under the juvenile court's jurisdiction and later after his case was transferred to the trial court. Dr. Phillips testified that, after each time she evaluated the Defendant, she determined that he was incompetent to stand trial. During her evaluation of the Defendant under the juvenile court's jurisdiction, Dr. Phillips conducted a clinical interview and administered the adolescent edition of the Minnesota Multiphasic Personality Inventory test to the Defendant. She also administered the Shipley Institute for Living Scales test and "read a variety of legal documents[,]" including the juvenile court petition and reports from law enforcement officers. Dr. Phillips also interviewed the following individuals: Gayle Cron, the Defendant's grandmother; Ryan Voss, the Defendant's eighth-grade social studies teacher; Emily Reyes, the Defendant's ninth-grade teacher; Chris Burgett, the Student Resource Officer for the Defendant's school; and a nurse from the Sumner County Jail. Dr. Phillips also looked at the Defendant's school records, his journal, and a report from Youth Villages. Dr. Phillips spent approximately seven hours with the Defendant during her initial observation for the juvenile court, and she spent an additional two hours with him for her evaluation for the trial court.

Dr. Phillips testified that the Defendant was psychotic, which she defined as a range of symptoms "that would tend to render a person not in good contact with what we would call reality and so forth."[1] She stated that psychosis also "include[s] cognitive symptoms such as unclear thinking [or] confused thinking." Dr. Phillips stated that the Defendant informed her that he heard voices, and she noted that records indicated that the Defendant "heard these voices for years[.]" Dr. Phillips stated that the Defendant "seem[ed] to resist doing what [the voices] say[,]" but she noted that "that's not exclusively true." She stated that the Defendant had spoken in a "flat manner" since he entered middle school. Dr. Phillips also stated that the Defendant had been delusional and "had beliefs about the guards at the jail trying to poison him or trying to otherwise hurt him," which Dr. Phillips believed were not based on reality. Dr. Phillips concluded that the Defendant was not "malingering" because he heard voices "long before there ever was a death in his family." She also noted that the Defendant's symptoms showed "a resounding consistency" and that the Defendant's description of the voices he heard was consistent with the descriptions of individuals diagnosed with psychosis and were "nondramatic." Dr. Phillips explained that an individual who is trying to malinger

---

[1] Under the DSM-TR-4, Dr. Phillips diagnosed the Defendant as suffering from "a psychotic disorder, not otherwise specified"; she was unsure of how to diagnose the Defendant under the DSM-5. Dr. Phillips noted that the Defendant's "presentation of any of the possible diagnoses [wa]s most atypical[.]"

"typically gives you a very exaggerated view of their symptoms and is not consistent with the way that other people do that . . . are psychotic."

Dr. Phillips stated that she had not "seen anyone in [her] [thirty-six]-years-plus experience who functions the way [the Defendant] does who is not autistic." She noted that "[t]he divide line between [the Defendant's] emotions and his thoughts [was] extremely, extremely deep," which "ma[de] it very hard for him to reach rational decisions and so forth." Dr. Phillips believed that the Defendant did not understand "the jeopardy of his situation" because, although he could explain what might happen in his case, "he ha[d] no emotional reaction to these sorts of things." Dr. Phillips explained that she initially diagnosed the Defendant as suffering from post-traumatic stress disorder ("PTSD"). However, she explained that "[t]he finding of [PTSD] depends upon having experienced a traumatic event" and that the Defendant claimed he was raped by his brother. She stated that the Defendant believed that this incident happened; however, she could not confirm whether the incident occurred and thus could not confirm a diagnosis of PTSD. Dr. Phillips also testified that, although the death of the Defendant's father was traumatic for the Defendant, it did not meet the qualifications of PTSD because it was not "outside the experience of most human beings." Dr. Phillips also testified that the Defendant suffered from major depression. She stated that, as a sixteen-year old, the Defendant did not have the same coping skills as an adult. Dr. Phillips stated that the Defendant had very little interaction with other people and his thoughts were becoming more "internal."

Regarding her prior evaluations of the Defendant, Dr. Phillips stated that, when she evaluated the Defendant for the juvenile court and when she evaluated him in October 2012, she determined he was not competent. Then, the Defendant moved to Middle Tennessee Mental Health Institute ("MTMHI") and received "competency training." The staff at MTMHI believed the Defendant was competent, and he returned to the Sumner County Jail on November 28, 2012. Dr. Phillips stated that she had visited the Defendant ten times since he returned to the Sumner County Jail and that she never believed that he was competent because the Defendant did not have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding."

Regarding the standard of competency set out in *State v. Blackstock*, 19 S.W.3d 200 (Tenn. 2000), Dr. Phillips stated that "in general," the Defendant's "strength with respect to competency" was his understanding of the facts of the criminal process, but she also stated that she was "concerned of late as to what his retention [was] of certain aspects that were not well learned before all this matter came to light." She explained that, while the Defendant understood that he was charged with criminal offenses and the role of trial counsel, she believed that the Defendant was "having declining memory." She also stated that the Defendant was unable to assist in his defense because the

Defendant was unable "to think of his legal situation in a dispassionate, logical, rational manner" and because the Defendant was distracted by the voices that he heard, particularly that of his deceased father. She noted that the Defendant did not "probably appreciate[] all the legal jeopardy, what it would mean to be in prison for life." She also noted that she spoke with the Defendant the morning of the hearing and that he did not understand "that the district attorney [was] acting as a prosecutor." She explained that she and other mental health professionals had explained the roles of the prosecutors and the judge to the Defendant probably twenty to forty times, but the Defendant was still confused about the roles of those individuals. Dr. Phillips stated that the Defendant's inability to remember and understand things like the prosecutor's role in his case was not related to his intelligence or a developmental issue.

Regarding the Defendant's ability to communicate with trial counsel, Dr. Phillips testified that the Defendant did not have "sufficient ability to consult with counsel," nor was he able to assist in the preparation of his defense. She stated that the Defendant was not able to sufficiently communicate with trial counsel because of cognitive issues, communication issues, hearing voices, and his lack of concern. Dr. Phillips explained that the Defendant spoke in a "low monotone[,]" "[t]he cadence of his speech never varie[d]," and "his affect [was] absolutely flat[.]" She also noted that the Defendant did not volunteer helpful information when he spoke with others. She explained that, when she asked the Defendant a straightforward question, he told her that he did not understand what she was asking. Dr. Phillips believed that the Defendant's ability to communicate affected his competency because if she had trouble communicating with the Defendant, it was likely that an attorney would have difficulty communicating with him. She also noted that the Defendant "d[id] not have that much invested in the outcome" of his case, which could affect his competency because he was not "particularly motivated to come up with other sorts of helpful information to his attorney." While the Defendant had "consistently" informed Dr. Phillips that he did not want to "serve so much time in prison," she believed that the Defendant did not appreciate the difference between a sentence of five years and a sentence of fifty years. She also noted that juveniles typically do not understand the passage of time like adults do.

On cross-examination, Dr. Phillips agreed that a person's lack of concern for the outcome of his case did not, in itself, make that person incompetent to stand trial. She noted that, when she initially evaluated the Defendant under the juvenile court's order, the Defendant gave her "a moment to moment account of what happened" and later gave her information regarding his background and family history. However, she stated that, when she learned "much later" that the Defendant heard voices, she asked him why he did not tell her about the voices, and he stated that he did not trust her enough to tell her. She explained that the Defendant's lack of trust affected his ability to communicate with trial counsel because she was concerned that the Defendant's decision to not trust her was

not rational. She stated that she would have expected the Defendant to share "more about his mental condition, what his thoughts were prior to the alleged offenses, what his thinking was afterwards in terms of what he did, why did he do what he did" with trial counsel. Dr. Phillips stated that the Defendant's IQ score was 111, and she noted that scores between ninety and 110 were "average[.]"

When the trial court asked Dr. Phillips about the Defendant's ability to converse, she stated that the Defendant did not speak unless someone asked him a question. She noted that he responded to questions, but he frequently stated that he did not understand the question. When the trial court asked Dr. Phillips if the Defendant could become competent to stand trial, she stated that "it would certainly help if he were able to interact with other individuals[.]" Dr. Phillips recommended moving the Defendant to a hospital and that "a number of psychiatrists should consult about the issue of medication[.]" Dr. Phillips also recommended that an autism expert evaluate the Defendant. Lastly, Dr. Phillips noted that, while the Defendant generally spoke with a flat affect, he would occasionally "put his head down, look to the side, and he w[ould] give a big grin, and he may even laugh a little bit." She noted that "most [of the] times when he d[id] it, it [was] entirely inappropriate to whatever someone [wa]s talking about." She explained that this inappropriate laughter was another indicator of psychosis.

On redirect examination, Dr. Phillips stated that the Defendant's conversation style was not typical because his tone of voice lacked spontaneity, he did not initiate conversation, his eye contact was inconsistent, and he lacked "body language." She stated that she did not believe that the Defendant's reticence to answer questions was due to his stubbornness because he "comes across as extremely polite, compliant even[.]" Dr. Phillips believed that the fact that the Defendant had been speaking with a flat affect for many years could indicate that he had a chronic illness that had not been treated. She stated that it was her understanding that the Defendant had previously received mental health treatment, but she was unable to obtain the records from his previous treatment. Although the Defendant was able to describe the events of the offenses to law enforcement during his initial interview, Dr. Phillips did not believe that the Defendant's ability to describe the event meant he was also competent to stand trial; she stated that the Defendant also "need[ed] to be able to describe what was going on in his head, what he was thinking, how long had he been thinking it, how he was feeling," which the Defendant had not done.

Dr. Bradley Freeman testified that he was a psychiatrist in the department of forensic services and the child and adolescent department at Vanderbilt University Medical Center. The trial court admitted Dr. Freeman as an expert in forensic psychology and adolescent psychiatry. Dr. Freeman conducted a forensic evaluation of the Defendant; he interviewed the Defendant, reviewed documentation such as police

records, school records, and historical records, the Defendant's treatment records from MTMHI, and the Defendant's personal writings. Dr. Freeman stated that he first interviewed the Defendant on August 7, 2013 and noted that the Defendant "seemed to be somewhat resistant to [Dr. Freeman] interviewing him" and that the Defendant "offer[ed] very limited responses to a variety of questions." Dr. Freeman stated that, in all of his interviews with the Defendant, the Defendant "never varied in his speech or posture or presentation throughout the interview[,]" which Dr. Freeman found to be odd. Dr. Freeman noted that the Defendant reported hearing voices, particularly the voice of the Defendant's deceased father. Dr. Freeman also noted that his interaction with the Defendant was unlike many of his clients because Dr. Freeman interviewed the Defendant at the request of the Defendant's trial counsel, yet the Defendant "was still unwilling to divulge or give much information about the history that [Dr. Freeman] was asking him." Dr. Freeman believed that the Defendant's reluctance to divulge information was not due to stubbornness; he thought that the Defendant may have been "paranoid or concerned about [Dr. Freeman's] motives in interviewing him."

Dr. Freeman also watched the Defendant's interrogation interview and visited the Defendant twice while he was housed at the Sumner County Jail. He described the Defendant as "distant, robotic, unemotional, and suspicious." Based on the DSM-5,[2] Dr. Freeman believed that the Defendant met the criteria for schizophrenia and mood or depressive disorder. Based upon his evaluations, Dr. Freeman stated that the Defendant was not competent to stand trial at that time. Regarding the *Blackstock* standard of competency, Dr. Freeman stated that the Defendant understood that he was charged with criminal offenses and that he could go to trial for those charges; however, Dr. Freeman was "not sure that [the Defendant] fully underst[ood] the severity of the potential outcomes[.]" Dr. Freeman did not believe that the Defendant had "the ability to fully consult with his attorney" due to "his mental illness and his guarded nature." Dr. Freeman described the Defendant's ability to communicate as the following:

> Typically, when a client talks with their attorney, they have a conversation about pros and cons and what to do and strategy. [The Defendant] does not interact that way with me or with his attorney, from what his attorney has told me.
>
> I ask [the Defendant] questions about, you know, has he thought about how the trial might ensue, and he basically responds, "I don't know." And he'll do that repeatedly, even with small questions or questions that

---

[2] Dr. Freeman later explained that the DSM, or Diagnostic and Statistical Manual, was "a collection of information regarding mental illnesses, including criteria and other information surrounding the illness itself." He stated that the versions of the DSM "change from time to time as the research progresses."

should be fairly easily answered. He just has difficulty communicating the entire picture to me and to his attorney, I would imagine.

Dr. Freeman concluded that this difficulty to communicate would impact the Defendant's ability to create a defense; he stated that the Defendant's communication was not "spontaneous enough or adequate enough to really build a meaningful defense or really to work with his attorney."

Dr. Freeman also stated that the Defendant was not able to participate in his own defense; however, Dr. Freeman was unsure of what prevented the Defendant "from being more open and candid and offering information spontaneously about the case to assist in his defense." Dr. Freeman explained that the Defendant did not fully understand the concept of plea bargaining. During his evaluation of the Defendant, Dr. Freeman offered the Defendant several scenarios, such as a defendant going to trial where the evidence was heavily weighted in favor of their guilt or their innocence. Dr. Freeman noted that the Defendant "wasn't really interested in what evidence there was or wasn't[,]" but the Defendant was interested "in the idea that if someone . . . actually did something, then they should just plead guilty for it and be done with it." Dr. Freeman believed that this showed that the Defendant was "just not interested or motivated to mount much of a defense." Dr. Freeman also noted that the Defendant did not understand the State's burden of proof even after he explained the concept to the Defendant several times. Dr. Freeman was unsure of whether the Defendant could "maintain his focus enough to participate in his defense[.]" The Defendant also had difficulty looking at legal issues or evidence from different perspectives; Dr. Freeman stated that this was "fairly typical of patients that have psychosis" because "[t]hey get stuck with their thoughts." Dr. Freeman also discussed differences between juvenile competency and adult competency and stated that juveniles "don't challenge things when they think that they should."

Dr. Freeman also testified that the Defendant's symptoms of mental illness included hallucinations, hearing voices, flat affect, depressive symptoms, guardedness and suspiciousness, paranoia, and his communication style. He stated that it was his understanding that the Defendant had spoken with a flat affect for "several years prior to the incident at hand, which [wa]s very concerning." Dr. Freeman noted that MTMHI did not recommend that the Defendant take medication because the staff did not diagnose him with psychosis. In contrast, Dr. Freeman believed that the Defendant was suffering from psychosis, and he explained that psychosis was primarily treated with medication. Dr. Freeman noted that the Defendant was currently taking a medication, and he opined that the medication could help the Defendant become competent to stand trial. Dr. Freeman believed that the Defendant was not malingering because his manner of presentation was the same during court proceedings as when Dr. Freeman interviewed the Defendant previously. Dr. Freeman also believed that the Defendant could not "consult

rationally with his attorney at th[at] point[,]" that the Defendant was not "able to adequately assist in his own defense[,]" but that the Defendant was "able to understand the factual basis of the trial." Dr. Freeman stated that he did not believe that the Defendant was competent to stand trial at that point in time.

On cross-examination, Dr. Freeman stated that he examined the Defendant on August 7, 2013, August 26, 2013, and September 10, 2013. Dr. Freeman estimated that he spent a total of five or six hours in personal contact with the Defendant during those examinations. Dr. Freeman agreed that the Defendant told him what offenses he had been charged with and his version of the events underlying the offenses. Dr. Freeman also agreed that the Defendant informed him that the Defendant's father died of "ALS" or amyotrophic lateral sclerosis and that the Defendant heard his father's voice telling him to punish his mother and kill his brother. During Dr. Freeman's interview of the Defendant on September 10, 2013, the Defendant informed Dr. Freeman that his brother raped him after he, his mother, and his brother moved from Bowling Green, Kentucky, to Tennessee. Dr. Freeman noted that there was no record that the Defendant had ever been evaluated for "development disorders such as Asperger's [disorder] or autism." Dr. Freeman agreed that the Defendant's trial counsel observed the September 10 interview and gave Dr. Freeman "some input" during the interview. Dr. Freeman also agreed that the Defendant initially asked to receive the death penalty in a letter to his trial counsel and that the Defendant initially believed that "a life sentence meant being incarcerated [eighty] to [ninety] years." However, Dr. Freeman informed the Defendant that an individual who received a life sentence would be eligible for parole after fifty-one years. The Defendant informed Dr. Freeman that he had previously received mental health treatment at Life Skills, Incorporated ("Life Skills"), but he stopped receiving treatment because his mother was angry with his treatment provider.

Dr. Freeman also agreed that his evaluation of the Defendant was based in part on the TBI's analysis of the Defendant's electronic devices. Dr. Freeman agreed that the TBI found "heterosexual pornographic videos, music videos, video clips about a variety of assault weapons, and various audio files that appeared to be sound clips" on the electronic devices and that one of the music videos was of a song by Eminem that referenced the suicide of "a murderer who has no real memory of the crime[.]" Dr. Freeman also agreed that the pornography did not contain "masochistic or sadistic themes[.]" Because he could not confirm that the Defendant had sole access to the electronic devices, Dr. Freeman "didn't give [the evidence] as much weight as [he] could have if [he] had known that that was something that [the Defendant] only had access to." Dr. Freeman agreed that the TBI discovered that someone had accessed websites containing information about recent murders, "[v]ideo game cheats, pornography, [and] an article about the signs, symptoms, and diagnoses of schizophrenia[.]" Regarding his review of the Defendant's personal writings, Dr. Freeman agreed that the Defendant's

letter to his grandparents, which he wrote in his "jail journal" in October 2012, reflected rational and appropriate thoughts, such as indicating that the Defendant liked his grandparents' visits. Dr. Freeman agreed that as a part of his evaluation, he considered a note from January 9, 2008, in the Defendant's mental health records from Life Skills that stated that the Defendant's mother informed Life Skills that the Defendant "was drawing graphic cartoons of people being blown up and heads cut off, etcetera, and that she took him off of Zoloft." Dr. Freeman explained that this note "did not have much of an impact on [his] overall opinion only because [he] had very little information about that particular note in the chart." However, Dr. Freeman stated a note from Life Skills stating that the Defendant "was obsessed with death before his father fell ill" was "concerning."

Regarding the Defendant's observation, after discussions with trial counsel, that he could receive a life sentence with the possibility of parole, Dr. Freeman stated that this observation was "more factual than it [wa]s really rational" because the Defendant was stating "what someone in that position could get for those offenses." Dr. Freeman agreed that the Defendant could communicate factual responses to questions, but he stated that the Defendant had "trouble abstracting."[3] Dr. Freeman also agreed that the Defendant initially believed that "both the jury and the judge determine whether a defendant is guilty or innocent." Dr. Freeman informed the Defendant about the role of the jury, and the Defendant then stated that the trial court could convict or release a defendant. Dr. Freeman stated that these discussions showed that the Defendant knew "the court process[,]" but he disagreed that the Defendant's response was rational. Dr. Freeman agreed that the Defendant understood that the role of a defense attorney was to "help protect the case of a person [who was] legally inept[,]" and the Defendant was "unsure why somebody fluent in the legal system would need a defense attorney." Dr. Freeman agreed that the Defendant's statement that "being dishonest with his attorney could cause problems, and [that] it might result in unfair punishment" was a logical statement. Dr. Freeman explained that the Defendant "has moments where he is a little bit more clear" and that psychosis can "fluctuate."

Regarding the Defendant's belief that "the jury's role was to influence the judge's decision about guilt or not[,]" Dr. Freeman stated that the Defendant's belief was reasonable. Regarding the Defendant's statement that a plea bargain was "a guilty plea in which you can agree to a reduced sentence[,]" Dr. Freeman noted that the Defendant's statement occurred after Dr. Freeman educated him about the plea bargaining process.

---

[3] Dr. Freeman explained, "abstract thinking is a higher level function." He stated that:

> with individuals that have psychosis, they tend to have more of a concrete perspective on things. They're not able to think outside the box, so to speak. They're not able to think of alternatives. They can think of one way and one way only on how to do certain things.

He stated that the Defendant "does have the capacity to understand[,]" but the Defendant was "not able to consistently express that." Dr. Freeman explained that, when he interviewed the Defendant ten days before the competency hearing, the Defendant was "not able to come up with the purpose of plea bargaining." Dr. Freeman stated that, after he educated the Defendant about the court process, the Defendant "was able to repeat what [Dr. Freeman] had said[,]" but the Defendant only incorporated the information "for short periods of time."

Dr. Freeman stated that trial counsel had reported difficulties communicating with the Defendant and that Dr. Freeman had observed these difficulties. Dr. Freeman explained that the Defendant was "not the type of client or individual that w[ould] spontaneously give you information or think about things to consider in the course of his defense." Dr. Freeman also stated that, when he asked the Defendant open-ended questions, the Defendant frequently stated that he did not know, he could not remember, or that he did not understand the question. However, Dr. Freeman noted that the Defendant "was able to understand what [Dr. Freeman] communicated to him and he can repeat that back . . . ."

Dr. Freeman explained that the Defendant could not adequately assist in the preparation of his defense, despite his ability to give details of the offenses to Dr. Freeman and trial counsel. While the Defendant could provide the information "for a limited time," Dr. Freeman believed that the Defendant could not "process enough and volunteer enough and work with [trial counsel] enough to really mount a defense that is sufficient." Dr. Freeman stated that, to help prepare his defense, the Defendant could share his "thoughts on what he wants to do," but the Defendant "didn't really have much of an understanding about what could happen[,]" outside of his knowledge that his case could proceed to trial. Dr. Freeman noted that the Defendant "essentially had no response" to Dr. Freeman's question of "what [the Defendant] would like to see happen after the end of this hearing."

Regarding his diagnosis of the Defendant as suffering from paranoid-type schizophrenia, Dr. Freeman explained that:

> the classic idea of schizophrenia is the downward spiral. That's when symptoms start to develop when they are younger. Typically, the first break is when they are in their late teens or early 20's, and they have more and more difficulty as that disease progresses and their functionality declines with that increase in symptoms.

He also observed that, "initially, when people have their first break, it could be very dramatic and people can end up in the hospital or there can be subtle signs of what [is]

call[ed] a prodrome, which proceeds the onset of the disorder." Dr. Freeman noted that prodrome "looks like depression for most patients" and that the individuals have "negative symptoms" that "predominate"; negative symptoms include "depressed affect, withdrawal, isolation, poor communication with others, restriction of their activities." Dr. Freeman noted that the Defendant stated that he began hearing voices after his father's death, which helped support the diagnosis of paranoid-type schizophrenia. He also noted that "individuals that have been traumatized or individuals that have undergone significant change, for instance, the death of a father, could experience a depression that has some of those psychotic features as well."

After agreeing that the DSM-TR-4 stated that flat or inappropriate affect was not a prominent feature or symptom of paranoid-type schizophrenia, Dr. Freeman noted that the typical symptoms for a mental illness might not apply to every individual. He stated that the Defendant had a "psychotic process" that he believed was "primarily a paranoid type" because he "had been told that [the Defendant] believed that he was going to be raped at the jail or murdered at the jail [and] that he did have auditory hallucinations." Dr. Freeman stated that the Defendant's symptoms "were consistently genuine psychosis." Dr. Freeman agreed that an individual with paranoid type schizophrenia could be competent to stand trial. He explained that "[t]here are individuals that function quite well with schizophrenia as long as they're on medication and under the appropriate treatment." Dr. Freeman stated that some of the Defendant's personal writings expressed logical thoughts but stated that the writings were consistent with an individual diagnosed with paranoid-type schizophrenia. Dr. Freeman stated that it was possible that the Defendant was competent when he wrote a letter to his brother in October 2012, but he was not competent at the time of the hearing. Dr. Freeman noted that, in the letter, the Defendant advised his brother to obtain a job to earn money and advised against doing drugs; Dr. Freeman agreed that these were logical thoughts.

Regarding the Defendant's ability to function in society, Dr. Freeman noted that the Defendant's grades in school decreased, he was "more isolative[,]" "his affect was flat, [and] his speech was monotone." Dr. Freeman also explained that "genuine hallucinations don't typically happen continuously throughout the day" and that the Defendant's hallucinations occurred "when he's alone at night, primarily, getting ready for bed, and when things are quiet." Dr. Freeman also noted that the guidance counselor at the Defendant's school informed him that the Defendant was one of seven students "out of a census of 800 at the school" who most concerned her. Dr. Freeman suspected that the Defendant's "concerning behaviors that people had identified prior to this incident" were part of the Defendant's prodrome into psychosis.

Dr. Freeman saw the Defendant on January 3, 2014, and again the morning before the hearing began. Dr. Freeman stated that the Defendant was not "getting any better"

and that the Defendant was "a little bit more isolative." Regarding the Defendant's ability to become competent, Dr. Freeman stated that the Defendant "would do better in a hospital setting" and should be treated with medication to improve his symptoms and functioning. Dr. Freeman also stated that the Defendant should "continue to be involved in some type of therapy that could be provided in the hospital setting to help with his depressive features." He agreed that a six-month treatment period would be a reasonable period to determine whether the Defendant could become competent.

On redirect examination, Dr. Freeman noted that individuals "with psychosis or delusions can sometimes communicate very well." Dr. Freeman also explained that individuals on the autism spectrum may have "splinter skills[,] where they excel in certain areas but are drastically deficient in other areas." Dr. Freeman stated that, if the Defendant did not receive mental health treatment, the Defendant "would have trouble operating at [a] level to consider plea bargains and make those decisions over a period of time." He believed that the Defendant's lack of ability to think abstractly was "partly due to his diagnosis and the treatment of his diagnosis" and that his difficulty in thinking abstractly made it more difficult for the Defendant to communicate with trial counsel and assist in his defense because the Defendant was unable "to think about things from different perspectives and hypothesize what could happen in certain scenarios[.]" Dr. Freeman stated that the Defendant's intelligence was "at least average." He testified that the Defendant's long-term memory may be affected because the Defendant was able to repeat what he had learned at the end of his interviews with Dr. Freeman, yet the Defendant had "difficulty in between sessions remembering that information," which would also make it difficult for the Defendant to adequately communicate with trial counsel or assist in the preparation of his defense.

On recross-examination, Dr. Freeman explained that the Defendant was not using abstract thinking when he composed his school essays[4] on why he skipped class because the essays were "more along the lines of reiterating things that have happened concretely in the past." However, Dr. Freeman agreed that the Defendant's essays showed abstract thinking when he mentioned a need for substitute teachers to assist the teachers and students in his classes. Dr. Freeman also agreed that the Defendant used abstract thinking in his letter to his brother. When the trial court asked Dr. Freeman if the Defendant's current solitary confinement in the Sumner County Jail affected his mental health, Dr. Freeman stated that solitary confinement was a barrier to the Defendant's improvement.

Dr. Rokeya Farooque testified that she was a forensic psychiatrist in the forensic service program at MTMHI and that she conducted court-ordered evaluations for forensic patients in Tennessee. After the trial court admitted Dr. Farooque as an expert in forensic

---

[4] The record includes several essays written by the Defendant for school.

psychiatry and adolescent forensic psychiatry, she testified that she examined the Defendant when he was admitted to MTMHI for an inpatient forensic evaluation from October 30, 2012 to November 28, 2012 under the trial court's order based on Tennessee Code Annotated section 33-7-301(a).[5]   Dr. Farooque stated that she, along with a psychologist and a social worker, observed the Defendant once a day and that the nursing staff in the inpatient unit left notes updating her on the Defendant's condition in her absence.  She ensured that the Defendant understood the charges against him, what could happen if he was found guilty, and the length of possible prison sentences, such as a life sentence.  She also asked the Defendant about the offenses and about his relationship with trial counsel.  Dr. Farooque noted that she and the other mental health professionals at MTMHI reviewed information from "the outside agencies" before making a conclusion regarding the Defendant's competency.  After evaluating the Defendant during this period, Dr. Farooque concluded that the Defendant was competent to stand trial, that the Defendant understood the nature and purpose of court proceedings and the role of different individuals in those proceedings, and that the Defendant was capable of communicating with trial counsel and assisting in the preparation of his defense.

Dr. Farooque testified that the Defendant was admitted to MTMHI for a second evaluation under Tennessee Code Annotated section 33-7-301(a) from February 14, 2013 to March 8, 2013, and she again concluded that the Defendant was competent to stand trial after this second evaluation.  During this evaluation period, the Defendant told Dr. Farooque that he believed the guards at the Sumner County Jail were attempting to harm him.  However, Dr. Farooque did not prescribe any medication for the Defendant to help with these delusions because the Defendant did not continue to complain about the delusions.  When Dr. Phillips and the Defendant's trial counsel expressed concern about the Defendant's condition and when the Defendant began saving his medication to possibly attempt to overdose, Dr. Farooque determined that the Defendant needed to be admitted to MTMHI for a longer period of time.  Therefore, under Tennessee Code Annotated section 33-7-301(b),[6] the Defendant was again admitted to MTMHI from March 15, 2013 to October 3, 2013.  During this period, Dr. Farooque spoke with the Defendant about his mental condition, and the Defendant attended group competency therapy.  After her third evaluation of the Defendant, Dr. Farooque again concluded that

---

[5] Under section 33-7-301(a), trial courts may order inpatient forensic evaluation for a defendant's competency to stand trial or to determine the defendant's state of mind at the time of the offense.  Tenn. Code Ann. § 33-7-301(a).

[6] Under section 33-7-301(b), a trial court may order judicial hospitalization when it finds that "the defendant is competent to stand trial but that the failure to hospitalize would create a likelihood to cause the defendant serious harm by reason of mental illness . . ." and the defense attorney agrees with the findings.  Tenn. Code Ann. § 33-7-301(b)(1)(B).  The trial court must also determine whether "whether the defendant is substantially likely to injure the defendant or others if the defendant is not treated in a forensic services unit and whether treatment is in the defendant's best interest."  Tenn. Code Ann. § 33-7-301(b)(4).

he was competent to stand trial.  Dr. Farooque stated that "[s]ometimes [the Defendant's] features [were] odd" because the Defendant's presentation did not reflect any emotion and he spoke in a monotone manner, but she stated that those features did not factor into her competency evaluation.

Dr. Farooque spoke with the Defendant before the competency hearing, and she did not observe anything that changed her conclusion.  She noted that the Defendant began taking Risperdal, the medication that Dr. Freeman suggested, a few days before the hearing, but the Defendant had not noticed any effect yet.  Dr. Farooque also noted that she spoke with him about the concept of plea bargaining during this visit, and the Defendant explained to her that a plea bargain was a plea for a lesser sentence.  Dr. Farooque asked the Defendant whether he would accept a plea offer for ten to fifteen years from the State, and the Defendant said he would.  The Defendant also informed Dr. Farooque that he occasionally heard voices during the night.  Dr. Farooque could not explain why the Defendant sometimes reported hearing voices and sometimes did not report hearing voices.  She stated that at the Defendant's age, sixteen, "sometimes it's normal to hear voices, but those are very transient . . . [and] very less [sic] serious," but Dr. Farooque could not confirm that he was psychotic.  Dr. Farooque stated that the Defendant "never behaved inappropriately" but also acknowledged that when the Defendant was first admitted to MTMHI, he laughed inappropriately.  Dr. Farooque noted that the inappropriate laughter "went away" after a few weeks without treatment.  Dr. Farooque stated that the Defendant's statement in his letter to his brother that he wanted to work while he was in prison to support his family showed that the Defendant understood what could happen to him in the future.  Dr. Farooque also stated that she had never observed that the Defendant had issues with his memory.

Regarding Dr. Phillips' conclusion that the Defendant suffered from psychosis, not otherwise specified, Dr. Farooque noted that the DSM-5 did not recognize the "not otherwise specified" diagnosis.  She also noted that the DSM-5 did not recognize a multi-axis diagnosis, such as Dr. Freeman's diagnosis of "Axis I, schizophrenia, paranoid type[.]"  Dr. Farooque disagreed with Dr. Freeman's diagnosis of paranoid-type schizophrenia because schizophrenia was "a very serious mental disease[,]" and individuals with schizophrenia were "not able to form their thoughts in their head."  She explained that individuals typically developed schizophrenia in late adolescence or early twenties.  Dr. Farooque noted that a juvenile's symptoms of schizophrenia could develop insidiously or quickly.  However, individuals could also develop "early onset schizophrenia" between the ages of thirteen to seventeen or "very early onset schizophrenia" before the age of thirteen.  Dr. Farooque stated that individuals with these types of schizophrenia "cannot function[,]" "cannot form their thoughts[,]" and "cannot progress."  Dr. Farooque concluded that the Defendant did not suffer from early onset or very early onset schizophrenia because he "was making good grades" and "was not

- 15 -

having any problems" in school before the offense. She noted that in the "report from the school teachers, nobody described that [the Defendant] was that . . . mentally sick." Dr. Farooque also noted that the Defendant showed good writing skills and that he had friends.

Dr. Farooque also believed that the Defendant was not suffering from Asperger's disorder; she explained that Asperger's disorder typically develops when an individual is two to three years old. However, there was no evidence that the Defendant's "functioning level" was affected when he was two or three years old. Dr. Farooque diagnosed the Defendant with major depressive disorder because the Defendant's father died suddenly when the Defendant was young. Dr. Farooque concluded that the Defendant understood the nature and object of the criminal proceedings, that he was capable of consulting with trial counsel, and that he was able to assist in the preparation of his defense. Accordingly, Dr. Farooque concluded that the Defendant was competent to stand trial.

On cross-examination, Dr. Farooque testified that she had doubts about whether the Defendant was suffering from psychosis; although "hallucination [was] a psychosis[,]" she stated that she was not completely sure that the Defendant heard voices. She explained that individuals who hear voices typically act and behave inappropriately and "will cause a problem from hearing voices." She noted that "in [the] forensic setting, [she] always ha[d] to consider whether they really hear[d] voices or they d[id]n't." She noted that some individuals hear voices when they are falling asleep, which was known as a hypnagogic hallucination, or when they are waking up, which was known as a hypnopompic hallucination. Dr. Farooque testified that both of these types of hallucinations are normal. Dr. Farooque stated that she was concerned that the Defendant heard his father's voice telling him to kill his mother and his brother, but she stated that "if he hear[d] voices, that's okay." She stated that the Defendant was not malingering because there was no secondary gain for him to fake symptomology.

Dr. Farooque agreed that she diagnosed the Defendant with major depressive disorder and that depression was a treatable mental illness; she explained that she did not treat the Defendant with medication because her "responsibility was to do the evaluation for the [trial] [c]ourt." She explained that she evaluated the Defendant and gave a recommendation to the mental health center in the Sumner County Jail. She agreed that adolescents do not function well in solitary confinement. Dr. Farooque agreed that she found the Defendant competent to stand trial after his second stay at MTMHI, and she stated that the Defendant was committed for a third stay because the Defendant attempted to commit suicide. She explained that during his third stay at MTMHI, she spoke with the Defendant and re-evaluated his mental health daily; the Defendant was also observed one-on-one by a staff person.

When asked about her conclusion that the Defendant did not suffer from Asperger's disorder, Dr. Farooque explained that Asperger's disorder was one form of autism. Dr. Farooque concluded, however, that the Defendant did not suffer from any form of autism, including Asperger's disorder, because "he had many friends when he was in Bowling Green, he had friends when he came to Hendersonville, and then slowly he didn't have that many friends." Dr. Farooque agreed that autism is diagnosed on a spectrum and that some individuals on the autism spectrum cannot function while others function normally. Dr. Farooque testified that the Defendant "has normal conversation skills, but he talks [with a] very low, very low tone[,]" and she acknowledged that the Defendant speaks slowly and does not elaborate in his answers. She concluded that the Defendant's manner of presentation did not necessarily affect his competency. Dr. Farooque acknowledged that the counselor at the Defendant's school stated that the Defendant was one of the seven most troubled children at the school; however, she stated that the Defendant's grades were good before his father's death and that "[h]e started showing the trouble after his father's death." She agreed that the Defendant had a mental health issue that had gone untreated after the Defendant's family moved to Hendersonville.

Dr. Farooque explained that the Defendant was admitted to MTMHI under Tennessee Code Annotated section 33-7-301(b) because trial counsel and Dr. Phillips were concerned about the Defendant and the Defendant was found with a piece of razor blade. The Defendant informed Dr. Farooque that he had the razor blade "'to take it to jail so that nobody c[ould] harm [him].'" Dr. Farooque also stated that she considered medicating the Defendant, but he stopped complaining about his symptoms, and "if somebody is psychotic, if he has some problem that he needs the medication, he's going to continue to complain about that."

Dr. Samuel Craddock testified that he worked in the forensic services unit at MTMHI as a psychologist. After the trial court admitted Dr. Craddock as an expert in forensic psychology, Dr. Craddock stated that he evaluated the Defendant while the Defendant was housed at MTMHI. Dr. Craddock conducted psychological testing on the Defendant, and "the results were essentially similar to what Dr. Phillips had found." Dr. Craddock also discussed the incident report with the Defendant to determine whether the Defendant had a basis to argue for the insanity defense or for diminished capacity. Dr. Craddock "met with [the Defendant] on six different occasions during his first admission, six occasions on his second admission, and then seven times during his third admission." After the Defendant's first period of evaluation, Dr. Craddock concluded that the

Defendant "met the requirements [for competency] under the *Dusky*[7] standard." Dr. Craddock diagnosed the Defendant with major depressive disorder.

During the Defendant's second admission to MTMHI, Dr. Craddock conducted more testing on the Defendant but primarily assessed the Defendant's competence and "read[] the daily progress notes to see if something was occurring during the time that [Dr. Craddock] hadn't seen him, something that would be inconsistent." Dr. Craddock was also concerned that the Defendant's working memory, which is "the type of information that he has to use that information and process it and give it back[,]" was not functioning properly. Dr. Craddock also noted that, after he educated the Defendant on the difference between competency and insanity, "there was a day that [the Defendant] seemed to question or couldn't distinguish between mental status at the present time versus mental status at the time of the offense." However, Dr. Craddock stated that the Defendant's memory issue did not affect his conclusion that the Defendant was competent to stand trial.

During the Defendant's third admittance to MTMHI, Dr. Craddock strictly focused on evaluating the Defendant's competence to stand trial and to determine whether there was any new information that was inconsistent with the information MTMHI had already obtained. Dr. Craddock learned that when the Defendant had been receiving therapy at Life Skills, "he had been medicated with Zoloft for a short while and then stopped." At the end of the third evaluation, Dr. Craddock again determined that the Defendant was competent to stand trial. Dr. Craddock stated that on March 16, 2013, he wrote a memorandum regarding the Defendant's third commitment at MTMHI. He explained that he wrote this memorandum recommending that the Defendant be recommitted to MTMHI because while the Defendant was housed in the Sumner County Jail, "he was doing some strange things. He would propose that maybe there was something in the vent, either he was being watched -- and expressed a paranoid thought about maybe people were out to hurt him [or] take his life." Dr. Craddock noted that it was not MTMHI's "desire to medicate people during this period of evaluation because [MTMHI] may not be seeing the true colors and be accused of not doing a good evaluation." Dr. Craddock testified that the Defendant was released to the Sumner County Jail after his third evaluation at MTMHI because he was competent to stand trial and "was no longer expressing intentions of harming himself."

Dr. Craddock believed that the Defendant understood the nature and object of the criminal proceedings and that the Defendant knew "who his attorney [wa]s, what the role of his attorney [wa]s, the role of the prosecutor, the judge, the jury, and so forth, and how

---

[7] Dr. Craddock was referring to the United States Supreme Court's opinion in *Dusky v. United States*, 362 U.S. 402 (1960).

the adjudication process plays out to determine someone's guilt or innocence." Dr. Craddock also believed that the Defendant was able to consult with trial counsel. He stated that "there's no argument that [the Defendant] doesn't communicate as though an attorney would hope that his client would," but Dr. Craddock did not "see [any] mental illness that [wa]s prohibiting [the Defendant] from conversing with his attorney if he so cho[se]." Dr. Craddock also concluded that the Defendant was able to assist in the preparation of his defense. Dr. Craddock stated that the Defendant seemed receptive to trial counsel's trial strategy and had not mentioned any belief that he would receive an unfair trial.

Dr. Craddock testified that the Defendant had "added information" to his version of the events underlying the offenses, and Dr. Craddock noted a minor inconsistency in the Defendant's story[8] but stated that the substance of the Defendant's story did not change over the course of his three evaluations at MTMHI. Dr. Craddock stated that the Defendant had "some features [that] an autistic person would have[,]" but he concluded that the Defendant was not on the autism spectrum because autism typically developed when the individual was three to four years old. He explained that, if the Defendant were autistic, "he wouldn't have been placed in a regular classroom and be[en] able to handle himself outside at all." Dr. Craddock did not agree with Dr. Freeman's diagnosis of paranoid-type schizophrenia because paranoid schizophrenia usually developed between thirty and forty years of age and because the Defendant did not show signs of schizophrenia.

On cross-examination, Dr. Craddock explained that, although he believed the Defendant was competent, the Defendant was evaluated several times because his mental health could have deteriorated. Dr. Craddock noted that, when the Defendant was first admitted to MTMHI, he was taking an anti-anxiety medication prescribed by the Sumner County Jail medical staff. The Defendant began saving the medication because he wanted to overdose on it, so MTMHI stopped treating the Defendant with the medication. Dr. Craddock agreed that the Defendant had mental health issues that did not clearly fit within a particular diagnosis in the DSM and that the Defendant could have "a serious mental illness, other than depression, that cause[d] him to behave the way he [did.]" Dr. Craddock also agreed that the Defendant's mental health issues were hard to diagnose. Dr. Craddock could not rule out the possibility that the Defendant stated that the Sumner County Jail guard wanted to harm him so that the Defendant would be transferred out of the jail. Dr. Craddock stated that he was "unsuccessful in engaging [the Defendant] in a

---

[8] The Defendant informed Dr. Craddock that he used whiskey as an accelerant for the fire because there was no gasoline in his mother's vehicle. However, investigators found that the vehicle had a full tank of gasoline.

conversation." He stated that the Defendant's lack of dialogue "very well could" affect the Defendant's ability to consult with trial counsel.

In response to a question from the trial court, Dr. Craddock stated that he disagreed with Dr. Phillips' diagnosis of "psychosis, not otherwise specified," based on his interactions with the Defendant. When asked if being in solitary confinement could affect the Defendant's mental health, Dr. Craddock responded that "[i]f [he] had to choose somebody in this room who would thrive probably being by themselves and reading, it would be [the Defendant]." On redirect examination, Dr. Craddock testified that "even with [the Defendant's] current mental illness of depression, he still meets the minimal standards of *Dusky*."

Gayle Cron testified that she was the Defendant's grandmother and that the Defendant's unusual behavior "became very prominent after the death of his father" on June 28, 2007, when the Defendant was nine years old. She stated that the Defendant became withdrawn and that she expressed concerns about the Defendant to his mother. Ms. Cron testified that one of the Defendant's teachers "asked for a conference with [his mother] because he was drawing pictures of disturbing things." The Defendant received mental health treatment at the Western Kentucky University Family Resource Center and at Life Skills as a child. While the Defendant was receiving mental health treatment from Life Skills, his medical doctor prescribed Zoloft for the Defendant. Ms. Cron stated that after the Defendant, his mother, and his brother moved to Hendersonville in 2008, she had regular contact with the Defendant on weekends until 2011. She stated that during this period, the Defendant did not speak, and he "was like a zombie or catatonic." When Ms. Cron addressed the Defendant's behavior with his mother, his mother stated that the Defendant was "just quiet like her." From 2011 until the offenses, Ms. Cron attempted to maintain contact with the Defendant and his brother, but his mother either stated that the Defendant and his brother were unavailable or informed Ms. Cron that she needed to contact the Defendant and his brother directly.

Ms. Cron testified that, since the offenses, she had visited the Defendant regularly. She first visited with the Defendant at a hearing in juvenile court; she stated that she would not have recognized him by his demeanor or appearance. The Defendant was not very interactive, and she was unable to carry on a normal conversation with him. She hired a tutor to assist the Defendant in obtaining his GED while he was housed at MTMHI. The tutor, John Boren, informed Ms. Cron that the Defendant "needed to be worked with continuously" because Mr. Boren frequently had to repeat his work with the Defendant. Ms. Cron testified that the Defendant had memory issues, and she stated that the Defendant did not "remember . . . most things that you would think people would remember, like things that [had] happened[.]"

On cross-examination, Ms. Cron stated that she last saw the Defendant and his brother during the spring of 2011. She stated that the Defendant acted in the same manner at the competency hearing in juvenile court as he acted when she first saw him after the offenses and while he was being evaluated at MTMHI. Ms. Cron stated that, when Mr. Boren began tutoring the Defendant, he tested the Defendant's math skills and determined that the Defendant's math skills were "somewhere between grade five and six."

The Defendant testified that he was currently housed in a solitary confinement cell at the Sumner County Jail. The Defendant discussed the various locations where he had been housed: the Sumner County Jail, the Sumner County Juvenile Detention Center, the Rutherford County Juvenile Detention Center, and MTMHI. The Defendant described the size and contents of his solitary confinement cell. The Defendant confirmed that he asked the jail personnel to turn off the lights in his cell. The Defendant stated that he hears his deceased father's voice several times a week during the night. He stated that his father's voice "sometimes tells [him] things to do, but it's mostly just conversation . . . ." He also stated that he hears other voices that say random insults and criticisms, but he did not recognize the voices. The Defendant stated that he was concerned for his safety in the Sumner County Jail because he believed that "there were people that were trying to harm [him,]" such as the guards and other inmates. He believed these individuals were trying to harm him because he thought he had heard "[t]hreats of torture and rape and things like that"; therefore, he obtained a weapon to use to defend himself. He stated that no guard had ever harmed him, but he still thought that there was a possibility that a guard would harm him, although he was "not as worried about it."

The Defendant testified that the District Attorney's Office worked for the State, and they "tr[ied] to prove that the defendant [wa]s guilty." He stated that the trial court "decide[d] if the defendant [wa]s guilty or not guilty" and that the jury's arguments and testimony could influence the trial court's decision. He also stated that trial counsel worked for his defense. He understood that he had been charged with criminal offenses of "[f]irst degree murder, arson, and attempted first degree murder." When asked about the potential penalties for the offenses he had been charged with, the Defendant responded that he had heard "that it [sic] could be given the death penalty." He then stated that trial counsel informed him that "juvenile inmates [cannot] be sentenced to death." He stated that a plea bargain was "an agreement for a reduced sentence" and that he had not been offered any plea bargains. When asked what he expected the jury to do if his case proceeded to trial, the Defendant initially stated that he did not "really know what to expect the jury to do[,]" but later agreed that the jury would listen to testimony and make decisions. He then stated that the jury "would help decide if the defendant was guilty or not guilty." He also stated that, if the jury decided the defendant was not guilty

but the judge believed the defendant was guilty, "[t]here would probably be a retrial." He then stated that "the judge decides if you're innocent or guilty."

The Defendant stated that he was "sometimes" reluctant to share his thoughts with other people because he had trouble expressing his thoughts. The Defendant noted that he began taking Risperdal approximately a week before the hearing, but he did not know what the medication was supposed to do. He stated that "robotic" meant "act[ing] with no emotion" or when people "do[] the same things again and again." He did not view himself as robotic; he said he was happy, but he "mostly just fe[lt] numb." He stated that he had felt numb for "most of [his] time as an adolescent." He also stated that it sometimes made him angry when people mentioned his brother. He testified that he generally spent twenty-four hours of each day in his solitary confinement cell; he was occasionally let out for an hour so that he could walk around in front of other cells or for visitation. When asked if he would like to be moved from solitary confinement, the Defendant responded that he would "be all right" with being around other people, but he stated that he did not "have that much of a problem with being . . . in solitary."

On cross-examination, the Defendant testified that, while he was going to school at Station Camp High School, he enjoyed his history and literature classes, but he did not like math. He stated that he liked and trusted trial counsel; he answered trial counsel's questions, and he asked trial counsel questions about his case when he was "confused about something." He stated that he last heard his father's voice a week before the competency hearing; his father's voice "talked with [him] about a memory that [he] had." He stated that his father's voice did not often tell him to do things. The Defendant stated that he disagreed with parts of Dr. Farooque's testimony; he stated that "when she talked with [him] in the treatment, she . . . never asked any direct questions." He stated that Dr. Farooque would ask him how he was doing, and then he would go back to his unit. He agreed that he spoke with Dr. Farooque before the competency hearing began and that Dr. Farooque correctly outlined their discussion during her testimony. The Defendant also informed the trial court that he told trial counsel about the circumstances surrounding the offenses and why he committed the offenses.

Sonya Troutt testified that she was the Sumner County Jail Administrator and that she oversaw the daily operations of the jail. She stated that the Defendant was housed in a cell in the medical unit. The Defendant ate his meals in his cell, and he was "offered at least once a day an hour outside the cell." Ms. Troutt stated that a jail officer observed the Defendant twenty-four hours a day. She explained that the Defendant would remain in solitary confinement until trial because it was "the designated area for any prisoner that [was] being housed as an adult that [was] under the age of [eighteen]." She also explained that the Defendant could not be transferred to the Rutherford County Juvenile

Detention Center because he was being tried as an adult. Ms. Troutt stated that the Defendant had not had any disciplinary issues while housed at the Sumner County Jail.

Jason Christison testified that he was the Medical Team Administrator at the Sumner County Jail and oversaw the medical treatment of inmates. Mr. Christison stated that the medical staff had not had any issues with the Defendant; however, he stated that "Youth Services was called [on] October 8[,] [2013] due to [the Defendant] stating that he was hearing voices [and] having some hallucinations." The Defendant was transported to the Sumner County Hospital for Youth Services to conduct an evaluation. Mr. Christison also testified that the Defendant was currently taking Benadryl, Claritin, and Risperdal.

The trial court credited the testimony of Dr. Farooque and Dr. Craddock "because of the amount of time and the effort that was placed in these different visits and examinations of the [D]efendant." The trial court found that Dr. Phillips and Dr. Freeman "placed a little too heavy a burden on the requirements of competency as they look[ed] at the emotional issues, emotional relationships, [and] relating emotions." The trial court found that Dr. Phillips observed the Defendant at least four times and wrote a report detailing her conclusions. The trial court also found that Dr. Freeman observed the Defendant three times and also wrote a report. The trial court noted that Dr. Farooque observed the Defendant over a course of three different periods for several months and that Dr. Craddock observed the Defendant a total of nineteen times during his stays at MTMHI. The trial court also noted that, at MTMHI, Dr. Farooque and Dr. Craddock were assisted by nurses and social workers to make their conclusions regarding the Defendant's competency.

The trial court found that, during the Defendant's testimony, he "was pretty well able to go from beginning to end on his stay here in the Sumner County Jail" and that "if he wasn't able to understand, he stopped and asked the question." The trial court found that the Defendant "talked about his [father's] voice[] and other voices, and he talked about being concerned for his safety in the jail and the fear, but most notably now he says that he doesn't take it as seriously as he used to." The trial court also found that the Defendant was able to sufficiently explain the roles of the attorneys, jury, and trial court in the criminal process. The trial court found that it was important that the Defendant stated that he had discussed the events underlying the offenses with trial counsel and that "it's evident through the reports from Dr. Phillips and the reports of Dr. Freeman that the [D]efendant remembers in specific, graphic detail what he did, why he did it, the way he did it, what he was doing." The trial court noted that the Defendant "had trouble communicating sometimes and expressing his thoughts[,]" but the trial court concluded that "that doesn't make one incompetent." The trial court also noted that the Defendant agreed that Dr. Farooque had spoken with him before the hearing and that she accurately

discussed their conversation during her testimony; the trial court stated that this fact was "absolutely key to [the trial court] in determining competency in this particular case."

The trial court considered *Dusky* and *Blackstock* and concluded that the Defendant had "the capacity to understand the nature and object of the proceedings against him." The trial court also considered the letter that the Defendant wrote to his brother and the essays that the Defendant wrote for school. The trial court concluded "that the [Defendant] has not proved by a preponderance of the evidence that [he] is incompetent." The trial court denied the Defendant's motion to be declared incompetent to stand trial.

*Suppression Hearing*

The Defendant filed a motion to suppress, arguing that his statement during a custodial interrogation should be suppressed because he was a minor and did not have a parent or guardian present and because he suffered from mental illness, which caused his waiver of rights to be involuntary and unknowing. At a hearing on the motion, Detective Don Linzy testified that he worked as the Chief of Detectives at the Sumner County Sheriff's Office. At approximately 12:08 a.m. on August 11, 2012, the Sumner County Sheriff's Office got a call regarding the Defendant's residence and responded to the scene. The Defendant's brother was at the scene, and the Sumner County Sheriff's Office began searching for the Defendant and processing the crime scene. Chief Detective Linzy stated that other detectives located the Defendant around 6:15 a.m.; the detectives saw the Defendant "walking down the street and stopped him, and he had a backpack with him and at that point [the detectives] called for assistance and had patrol deputies show up there along with Detective Lisa House." Detective House informed the Defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and the detectives placed the Defendant in a patrol vehicle. Chief Detective Linzy first observed the Defendant as he was sitting in the patrol vehicle; he stated that the Defendant "was very quiet and not saying anything at that point[.]" Chief Detective Linzy stated that none of the other detectives indicated to him that the Defendant had "any problems with his demeanor or his attitude or what he was doing." The detectives transported him to the Sumner County Sheriff's Office, and Chief Detective Linzy "directed the transporting officer to bring [the Defendant] to the criminal investigation division."

After the Defendant arrived at the criminal investigation division, Chief Detective Linzy removed his handcuffs and took the Defendant to the interview room. Chief Detective Linzy began to interview the Defendant at approximately 6:31 a.m., and he "went through each *Miranda* warning one by one" and "basically tried to break it down in the simplest terms [he] could for [the Defendant], and [he] reminded [the Defendant] over and over [again] of these rights." After the Defendant stated that he was willing to speak with the detectives, Chief Detective Linzy asked the Defendant to read the

admonition and waiver of rights form. The Defendant "read the last paragraph out loud after he read the first part of it." Chief Detective Linzy asked the Defendant to read the form out loud to ensure that the Defendant could read and comprehend the information. Chief Detective Linzy stated that the Defendant did not appear to be under the influence of any illegal drugs or alcohol; the Defendant also informed Chief Detective Linzy that he had taken an over-the-counter drug for his cold. The Defendant signed the waiver of rights form. Chief Detective Linzy stated that the Defendant did not seem reluctant to speak to him about the facts of the offenses. He stated that when he asked the Defendant questions, the Defendant "would respond pretty quick and he was very courteous during the entire interview . . . ." However, the Defendant was reluctant to discuss his motive for the offenses.

When asked about the efforts the Sumner County Sheriff's Office made to locate the Defendant's family members, Chief Detective Linzy stated that they "could not locate any." He explained that the Defendant's brother stated that family members in Kentucky were estranged and that the Defendant's maternal grandparents lived in Austria. Detective Linzy attempted to contact the Defendant's family members by telephone and requested that the Bowling Green Police Department go by the Defendant's grandparents' address in Kentucky, but the police could not locate his grandparents. Chief Detective Linzy also stated that, earlier that morning, he contacted District Attorney General Ray Whitley and asked whether the Sumner County Sheriff's Office could speak with the Defendant without a parent or guardian present if they found him. General Whitley advised Chief Detective Linzy to contact the juvenile court; after learning the details of the situation, the juvenile court authorized the Sumner County Sheriff's Office to speak with the Defendant without a parent or guardian present.

On cross-examination, Chief Detective Linzy agreed that the Defendant's speech and manner of speaking was odd, which caused Chief Detective Linzy to question the Defendant's mental health "a little bit." Chief Detective Linzy stated that he did not seek any further advice from the juvenile court despite his concern about the Defendant. When Chief Detective Linzy spoke with the juvenile court about questioning the Defendant without a parent or guardian present, he discussed the nature of the offenses with the juvenile court. However, at this point, Chief Detective Linzy was unaware of the Defendant's unique manner of presentation because his brother had not mentioned anything unusual about the Defendant. Chief Detective Linzy stated that, when the Defendant was apprehended, he did not make any attempt to avoid the detectives.

The trial court credited the testimony of Chief Detective Linzy and found that the Defendant was fifteen years old at the time of the offenses. The trial court also found that Detective House informed the Defendant of his *Miranda* rights before he was transported to the Sumner County Sheriff's Office. The trial court noted that Chief Detective Linzy

contacted District Attorney General Whitley about questioning the Defendant without a parent or guardian, and Chief Detective Linzy later received authorization from the juvenile court to question the Defendant without a parent or guardian. The trial court found that, during the interrogation, the Defendant answered questions completely and fully, that "[w]hen he had a question, he would stop and ask[,]" and that "[w]hen he was asked to explain, he explained." The trial court noted that the Defendant had a "unique monotone voice[.]"

The trial court also found that Chief Detective Linzy informed the Defendant of his *Miranda* rights before questioning him and that the Defendant was able to explain to Chief Detective Linzy what the rights meant. The trial court noted that, during the questioning, the Defendant told Chief Detective Linzy without reservation that he killed his mother with a sledgehammer, yet when Chief Detective Linzy asked the Defendant why he did that, the Defendant stated that he did not want to answer. The trial court stated that the Defendant's decision to not share particular information showed that "he's thinking here and he remembers what his rights are, and he's reflecting on that and taking advantage of that situation." The trial court also noted that the Defendant was able to relate details about his planning and commission of the offenses, which was "a sign of deliberation [and] rational thought process."

The trial court made the following conclusions: (1) the circumstances surrounding the Defendant's interrogation were not confrontational and the Defendant was not forced or coerced to waive his rights when considering his age, experience, education, and intelligence; (2) the Defendant was able to understand his *Miranda* rights and he "was capable of knowing what he was doing when he waived his rights"; (3) the Defendant was familiar with his *Miranda* rights because the detectives informed him of his rights twice and he was able to read and write in English; (4) the Defendant was not under the influence of any drug or alcohol that could have affected his ability to understand his *Miranda* rights; (5) although the Defendant had mental health issues, "that was no factor in him waiving his *Miranda* rights . . . to talk to the police"; and (6) both of the Defendant's parents were deceased and Chief Detective Linzy made every effort possible to contact the Defendant's family members in Bowling Green, so there was "no constitutional violation or no statutory violation here because a parent or guardian or family was not contacted." The trial court concluded that "there were no factors under this case referring to the facts of this investigation or the facts of this particular interview that would show a violation of [the Defendant's] constitutional rights" and denied the Defendant's motion to suppress.

- 26 -

*Jury Trial*

The Defendant's jury trial took place on April 13–16, 2015. This opinion will not summarize the majority of the testimony and evidence presented at the Defendant's trial for purposes of conciseness and will instead focus on testimony relevant to the Defendant's issues on appeal. During the Defendant's direct examination, the following exchange occurred between trial counsel and the Defendant regarding the Defendant's statement that he hears his father's voice:

[TRIAL COUNSEL]: What kind of instructions does [the voice] give you?

[THE DEFENDANT]: Things I should be doing.

[TRIAL COUNSEL]: Did one of those things involve your mother and your brother?

[THE DEFENDANT]: Yeah.

[TRIAL COUNSEL]: What did he tell you to do?

[THE DEFENDANT]: Uh, I pretty much took a fall for my brother.

. . . .

[TRIAL COUNSEL]: Do you remember telling Dr. Freeman that you said that your father had told you to kill your mother? Do you recall that?

[THE DEFENDANT]: I took a fall for my brother.

[TRIAL COUNSEL]: You what?

[THE DEFENDANT]: Took a fall for him. I didn't do it.

THE COURT: He said he took a fall for his brother.

[TRIAL COUNSEL]: Took a fall for your brother. What's that mean? I don't understand.

[THE DEFENDANT]: I took the blame.

[TRIAL COUNSEL]: You took the blame for your brother?

[THE DEFENDANT]: Yeah. I didn't do it.

[TRIAL COUNSEL]: What did your brother do?

[THE DEFENDANT]: Uh, he killed her with a sledgehammer.

[TRIAL COUNSEL]: Your brother killed your mother?

[THE DEFENDANT]: Yeah.

[TRIAL COUNSEL]: So, if that's the case, why would you be the one to confess?

[THE DEFENDANT]: I thought it was worth doing.

[TRIAL COUNSEL]: Okay. Why are you trying to protect your brother if he raped you?

[THE DEFENDANT]: We still loved each other.

. . . .

[TRIAL COUNSEL]: [The Defendant], since this happened, since your mother was killed, you've told virtually everyone who would listen that in fact you killed her. Do you realize that?

[THE DEFENDANT]: Yeah.

[TRIAL COUNSEL]: But that's not true?

[THE DEFENDANT]: I didn't kill her. I, uh, found the sledgehammer that he used, but that's it.

[TRIAL COUNSEL]: Okay. So why did you run?

[THE DEFENDANT]: I didn't want to get, uh, blamed for it.

[TRIAL COUNSEL]: You didn't what?

- 28 -

[THE DEFENDANT]:  I thought it would have gotten us in more trouble with the law.

[TRIAL COUNSEL]:  Okay.  Did you-all talk about this before it happened?

[THE DEFENDANT]:  No.  He just, uh, said he would -- uh, we didn't talk.

[TRIAL COUNSEL]:  So you-all didn't plan this together so that you would take the blame?

[THE DEFENDANT]:  We didn't plan it.

[TRIAL COUNSEL]:  Judge, I don't have any other questions.

On cross-examination, the Defendant again testified that he did not kill his mother and that he took the blame for his brother.

On the following day of trial, the Defendant moved for a mistrial on the grounds that the Defendant's trial strategy was based on the Defendant's admissions that he committed the offenses and the argument that the Defendant did not have the requisite mens rea to be found guilty of premeditated first degree murder.  Trial counsel stated that the Defendant's testimony caused him to give the Defendant ineffective assistance of counsel because trial counsel would have challenged the DNA evidence and would not "allowed a great deal of other evidence to be admitted without objection and without cross-examination had [he] known that was [the Defendant's] trial strategy."  Trial counsel stated that he spoke with the Defendant and consulted with the Tennessee Board of Professional Responsibility and that he could not confirm that the Defendant's testimony was false.

The trial court found that trial counsel had properly represented the Defendant and noted that the Defendant chose to change his version of the offenses when he testified.  The trial court found that "[i]t would be a terrible precedent for a defendant to be able to take the witness stand and testify to something contrary to what he told the attorney and then have a mistrial."  The trial court denied the Defendant's motion for mistrial.  The Defendant then renewed his motion to be declared incompetent to stand trial because his mental illness "rendered him unable to cooperate with [trial] counsel . . . ."  The trial court denied the Defendant's renewed motion to be declared incompetent and found that the Defendant "can answer questions[,]" was aware of the court proceedings, and was

"able to make a decision." The trial court also found that the Defendant "was the one that chose to get up there and make that statement and that he's going to be accountable for it." The jury found the Defendant guilty of first degree premeditated murder, attempted first degree premeditated murder, and aggravated arson. The trial court sentenced the Defendant to life in the Department of Correction for his first degree premeditated murder conviction; the trial court held a sentencing hearing to determine the Defendant's sentences for his remaining convictions.

*Sentencing Hearing*

After the trial court admitted the Defendant's presentence report into evidence, Ms. Cron stated that "[i]f [the Defendant] had been given the mental health treatment that was recommended by others, we would not be here today." Ms. Cron testified that the Defendant was "a child who made a horrible mistake." She asked the trial court to show compassion and leniency to the Defendant and asked that the Defendant "not . . . be forgotten here today as he has been forgotten so much of his life, especially after his father died."

The Defendant testified that he wanted the trial court to know that he "started the fire with the intent of destroying [his] living space." He stated that he told the jury that he did not kill his mother because he "learned that off the evidence [that he] saw" but then stated that he "hit [his] mom on the one side of her head." The Defendant "guess[ed] [that] [his brother] walked in on her after [he] left and finished it." The Defendant stated that the difference between consecutive and concurrent sentences was that "[o]ne [wa]s with the other charges." The Defendant understood that if the trial court ordered his sentences to run consecutively, those sentences would run after his life sentence. The Defendant then stated that "it deserves a retrial with newer evidence . . . ." On cross-examination, the Defendant agreed that he admitted to hitting his mother in the head with a sledgehammer.

The trial court considered the evidence presented at trial, the evidence presented at the sentencing hearing, the presentence report, the principles of sentencing, the nature and characteristics of the criminal conduct involved, and the Defendant's potential for rehabilitation. The trial court noted that the Defendant committed a brutal murder but was not legally insane. The trial court also noted that the Defendant deliberately planned the offenses, that he previously stated he would kill his brother with the sledgehammer if he could re-commit the offenses, and that he had shown no remorse for the offenses. The trial court found that the Defendant liked to play violent video games and was "obsessed with death" and withdrawn. Regarding the length of the Defendant's sentences, the trial court considered "the fact that [he] lack[ed] judgment because of [his] age in what [he] focused on and what [he] pursued[,]" but the trial court found that "as far as committing

- 30 -

the offense, there's all kind of judgment, premeditation, deliberation and so forth here." The trial court also noted that the jury rejected the argument that the Defendant suffered from diminished capacity when he committed the offenses. The trial court also considered the Defendant's mental health issues, his age, and that he did not have a prior criminal record. The trial court considered what sentence would be justly deserved in relation to the seriousness of the Defendant's offenses and noted that one person died and other lives were at risk in the commission of the Defendant's offenses. The trial court considered what sentence would be "sufficient to prevent crime and promote respect for the law[,]" and the Defendant's "potential or lack of potential for rehabilitation" and noted that the Defendant was "devoid of remorse, responsibility, appreciation for life, and potential for rehabilitation starts at ground zero or below." The trial court sentenced the Defendant to twenty years with a thirty percent release eligibility for his attempted first degree murder conviction and to twenty years with 100% release eligibility for his aggravated arson conviction.[9]

Regarding sentence alignment, the trial court noted that "the dangerous offender criteria must be based solely upon the circumstances surrounding the crime for which the defendant is being sentenced." The trial court found that there were "aggravating circumstances in the commission of this offense with the premeditation, the unnecessary slaughter and brutality, the lack of emotion that was felt, the attempt to kill [his] brother, and the attempt to burn a house down and possibly bring into perspective here more and more lives endangered." The trial court also found, by a preponderance of the evidence, that the aggregate term of consecutive sentences was reasonably related to the severity of the Defendant's offenses. The trial court noted that the Defendant killed his mother while she was sleeping and that the Defendant had "no regrets about spilling blood or brain matter anywhere[.]"

The trial court stated it was "bothered" by the issue of whether consecutive sentencing was necessary to protect the public from further injury by the Defendant; however, the trial court could not "really say that it is not necessary to protect the public at this time from [the Defendant]." The trial court noted that, after the offenses, the Defendant stated that he wanted to kill his brother and that "[i]t wouldn't bother him if he

---

[9] We note that, at the sentencing hearing the trial court ordered both of these sentences to be served with 100% release eligibility. However, on June 5, 2015, the trial court entered a judgment sheet for count 2, the attempted first degree murder conviction, which reflected a release eligibility of eighty-five percent and a judgment sheet for count 3, the aggravated arson conviction, which reflected a release eligibility of thirty percent. On August 18, 2015, the trial court entered amended judgments for count two, reflecting a release eligibility of thirty percent, and for count three, reflecting a release eligibility of 100% under Tennessee Code Annotated section 40-35-501(i). *See* Tenn. Code Ann. § 40-35-501(i)(1),(2)(J). "After giving any notice it considers appropriate, the court may at any time correct clerical mistakes in judgments, orders, or other parts of the record, and errors in the record arising from oversight or omission." Tenn. R. Crim. P. 36.

killed somebody by accident." The trial court also noted that the Defendant stated that he laughed while he hit his mother in the head with the sledgehammer and that the Defendant was "not truthful when [he] testif[ied] under oath." Therefore, the trial court found, by the preponderance of the evidence, that "the aggregate term of the sentences . . . impose[d] w[ould] reasonably relate to the severity of the offenses and [was] necessary to protect the public from further serious criminal conduct by [the Defendant]." The trial court ordered the Defendant's twenty-year sentences for his attempted first degree murder and aggravated arson convictions to run consecutively to his life sentence for his first degree murder conviction but concurrently with each other.

*Motion for New Trial*

Thereafter, the Defendant filed a timely motion for new trial and argued, in part, that the trial court erred in finding the Defendant competent to stand trial, in denying the Defendant's motion to suppress, and in denying the Defendant's motion for mistrial. In an amended motion for new trial, the Defendant argued, in part, that the trial court erred in sentencing the Defendant to a "de facto sentence of life without parole." The trial court denied the Defendant's motion for new trial after a hearing. The Defendant timely filed a notice of appeal.

## II. Analysis

On appeal, the Defendant presents the following arguments: (1) the trial court "erred in finding the Defendant was competent to stand trial and to effectively participate in his defense in that he was unable to effectively communicate in a meaningful way with his counsel in preparing his defense"; (2) the trial court "erred in denying the Defendant's [m]otion to [s]uppress the Defendant's [i]nterrogation by the Sheriff's Office on the basis that as a juvenile, the Defendant, . . . was entitled to speak with a family member or advisor prior to any waiver of his right to refuse to answer questions"; (3) the trial court "erred in denying the Defense Motion during Trial for a mistrial based upon the Defendant's wholly unexpected change in his version of the facts which demonstrated his inability to cooperate with counsel"; and (4) the trial court "erred in the imposition of sentence in this case in that as a juvenile, the Defendant could not be subject, [c]onstitutionally, to a sentence of life without parole . . . ." The State argues that the trial court did not err in determining that the Defendant was competent to stand trial, by concluding that the Defendant's confession was knowledgeable and voluntary, in denying the Defendant's motion for mistrial, and in sentencing the Defendant.

The Defendant argues that the trial court erred in determining that he was competent to stand trial because, up until his direct testimony at trial, the Defendant had stated that he killed his mother. However, during his direct testimony, the Defendant testified that his brother killed his mother and that the Defendant was covering for his brother. The Defendant argues that this sudden change was "evidence that [the Defendant] was not able to consult with his [trial] counsel nor was he able to assist in preparing his defense." The State notes that the trial court credited the testimony of Dr. Farooque and Dr. Craddock and contends that the Defendant failed to establish that the evidence preponderates against the trial court's finding of competence. Because it is unclear whether the Defendant seeks review of his initial motion to determine competency or his mid-trial motion, we will review each motion separately.

"The Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution prohibit the trial of a person who is mentally incompetent." *Blackstock*, 19 S.W.3d at 205 (citing *Pate v. Robinson*, 383 U.S. 375 (1966)). It is well-established that "[t]he standard for determining competency to stand trial is whether the accused has 'the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense.'" *Id.* (quoting *State v. Black*, 815 S.W.2d 166, 174 (Tenn. 1991)); *see also Dusky*, 362 U.S. at 402. In Tennessee, a defendant is presumed to be competent to stand trial, *State v. Johnson*, 401 S.W.3d 1, 17 (Tenn. 2013) (citing *State v. Reid*, 164 S.W.3d 286, 306–07 (Tenn. 2005)), thus, "[t]he burden is on the defendant to establish his incompetency to stand trial by a preponderance of the evidence." *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. 1991). The trial court must determine "'[w]hether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial.'" *State v. Kiser*, 284 S.W.3d 227, 245 (Tenn. 2009) (quoting *Williams v. Bordenkircher*, 696 F.2d 464, 467 (6th Cir. 1983)) (some internal quotation marks omitted). "[I]n determining a defendant's competency to stand trial, factors such as the 'defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant.'" *Id.* at 246 (quoting *Drope v. Missouri*, 420 U.S. 162, 180 (1975)). "Before a mental evaluation is required, the evidence must be such as to warrant a belief that the defendant is incompetent to stand trial, or it must be sufficient to raise a question as to his mental capacity at the time of the crime." *State v. West*, 728 S.W.2d 32, 34 (Tenn. Crim. App. 1986) (citing Tenn. Code Ann. § 33-7-301 (Supp. 1986); *State v. Lane*, 689 S.W.2d 202, 204 (Tenn. Crim. App. 1984)). "The findings of the trial court are conclusive on appeal unless the evidence preponderates otherwise." *Oody*, 823 S.W.2d at 559 (citing *Graves v. State*, 512 S.W.2d 603 (Tenn. Crim. App. 1973)). "The application of the law to the facts found by the trial court is a question of law that this

[c]ourt reviews *de novo*." *State v. Larry D. Anderson*, No. W2001-02371-CCA-R3-CD, 2003 WL 1872641, at *6 (Tenn. Crim. App. Apr. 11, 2003), *perm. app. denied* (Tenn. Sept. 2, 2003) (citing *State v. Daniel,* 12 S.W.3d 420, 423 (Tenn. 2000)).

### *Initial Motion to be Declared Incompetent*

The Defendant filed a motion to be declared incompetent to stand trial, and after hearing the testimony of two forensic psychiatrists, two forensic psychologists, and other witnesses, the trial court determined that the Defendant was competent to stand trial. The trial court credited the testimony of Dr. Farooque and Dr. Craddock because they and their staff at MTMHI had observed the Defendant for nearly a year. Dr. Farooque diagnosed the Defendant with major depressive disorder and disagreed with Dr. Phillips' diagnosis of psychosis, not otherwise specified, and with Dr. Freeman's diagnoses of paranoid-type schizophrenia and Asperger's disorder. Dr. Farooque testified that the Defendant understood the nature and object of the criminal proceedings, that he was capable of consulting with trial counsel, and that he was able to assist in the preparation of his defense. Dr. Craddock diagnosed the Defendant with major depressive disorder and concluded that the Defendant was competent to stand trial. He testified that the Defendant understood the nature and object of the criminal proceedings and that the Defendant knew "who his attorney [wa]s, what the role of his attorney [wa]s, the role of the prosecutor, the judge, the jury, and so forth, and how the adjudication process plays out to determine someone's guilt or innocence." Dr. Craddock also believed that the Defendant was able to consult with trial counsel; he stated that "there's no argument that [the Defendant] doesn't communicate as though an attorney would hope that his client would," but Dr. Craddock did not "see [any] mental illness that [wa]s prohibiting [the Defendant] from conversing with his attorney if he so cho[se]."

We conclude that the evidence does not preponderate against the trial court's finding of competence. Although Dr. Phillips and Dr. Freeman testified that the Defendant's mental illness obstructed his ability to communicate with his attorney and to assist in the preparation of his defense, the trial court credited the testimony of Dr. Farooque and Dr. Craddock, who testified that the Defendant was competent to stand trial. At the competency hearing, the Defendant testified that the District Attorney's Office works for the State and "tr[ied] to prove that the defendant [wa]s guilty." Although he incorrectly stated that the jury's arguments and testimony could influence the trial court's decision, he understood that the trial court "decide[d] if the defendant [wa]s guilty or not guilty" and that trial counsel worked for his defense. The Defendant also informed the trial court that he told trial counsel about the circumstances surrounding the offenses and why he committed the offenses. The evidence presented at the competency hearing supports the trial court's finding of competency. The Defendant is not entitled to relief on this ground.

### *Renewed Motion to be Declared Incompetent*

After the Defendant testified during direct and cross-examination that his brother actually killed his mother and that he had been covering for his brother, the Defendant renewed his motion to be declared incompetent to stand trial because his mental illness "rendered him unable to cooperate with [trial] counsel . . . ." The trial court denied the Defendant's renewed motion to be declared incompetent and found that the Defendant "can answer questions[,]" was aware of the court proceedings, and was "able to make a decision." The trial court also found that the Defendant "was the one that chose to get up there and make that statement and that he's going to be accountable for it."

In *Moten v. State*, 935 S.W.2d 416, 420 (Tenn. Crim. App. 1996), the petitioner argued that the trial court should have investigated his mental health status before accepting his guilty plea. This court favorably cited *United States v. White*, 887 F.2d 705, 709 (6th Cir. 1989) and *Pate v. Smith*, 637 F.2d 1068, 1071 (6th Cir. 1981), for the rule that "[f]ailure to order a hearing when the evidence raises a sufficient doubt as to an accused's competence to stand trial or enter a guilty plea deprives the accused of due process of law." *Id.* at 421. This court considered the facts before the trial court at the petitioner's guilty plea hearing and concluded that "a court exercising reasonable caution would not have experienced doubt with respect to the [petitioner]'s competence to enter guilty pleas" because the only expert who testified stated that the petitioner "possessed an I.Q. reflecting borderline retardation and a mental age of ten" but "conceded that his conclusions were contradicted by the [petitioner]'s academic record." *Id.*

In *State v. William Davidson Hamby, Jr.*, No. M2014-00593-CCA-R3-CD, 2015 WL 1897334, at *5 (Tenn. Crim. App. Apr. 27, 2015), *perm. app. denied* (Tenn. Aug. 13, 2015), the defendant asserted that the trial court should have ordered a second competency hearing after the defendant refused to attend his own trial. The defendant had previously been found competent to stand trial, and "[t]he defendant's temporary refusal to attend trial [wa]s the only indication in the appellate record that there had been any change in his mental health status since the evaluation [that] found him competent." *Id.* at *6. This court stated that "[c]onsidering all the facts and circumstances, including the prior evaluation, trial counsel's representation that the defendant had consulted with him regarding strategy the previous day, and the court's own recent observation of the defendant as 'lucid,' we cannot conclude that a reasonable judge would 'have experienced doubt with respect to competency to stand trial' such that the court was required to order a new evaluation." *Id.* (citing *Kiser*, 284 S.W.3d at 245 (Tenn. 2009)) (some internal quotation marks omitted).

We conclude that the Defendant's case is similar to that of *William Davidson Hamby, Jr.* because the Defendant also requested that the trial court rule on his competence in the middle of trial due to the Defendant's unusual actions. Prior to ruling on the Defendant's renewed motion to be declared incompetent, the trial court had held an extensive, two-day competency hearing and had observed the Defendant's demeanor and speaking ability during the Defendant's testimony on direct and cross-examination. The evidence does not preponderate against the trial court's finding that the Defendant was competent to proceed with the trial. A reasonable trial court would not have experienced any doubt that the Defendant was competent such that a second hearing was required. The Defendant is not entitled to relief.

### *Denial of motion to suppress*

The Defendant argues that the trial court erred in denying his motion to suppress his statement given to the Sumner County Sheriff's Office because he was unaccompanied by a parent or guardian and because he suffered from mental illness at the time of the questioning. The State asserts that "the trial court properly applied the [*State v. Callahan,* 979 S.W.2d 577, 583 (Tenn. 1998)] test and its factual findings are supported by a review of the record" and notes that "the trial court explicitly found that the police did not engage in any coercive activity during the interview."

When reviewing a motion to suppress, this court is bound by the trial court's findings of fact unless the evidence preponderates otherwise. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of credibility, the weight and value of the evidence, and resolutions of conflicts in the evidence are resolved by the trial court. *Id.* The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. *Id.* We review the trial court's conclusions of law de novo. *State v. Carter*, 160 S.W.3d 526, 531 (Tenn. 2005). In evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, this court may consider the proof adduced both at the suppression hearing and at trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides in pertinent part that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, Article I, Section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. The test of voluntariness for confessions under the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment. *State v. Crump*, 834 S.W.2d 265, 268 (Tenn. 1992).

A defendant may waive his rights under *Miranda* if such waiver is voluntary, knowing, and intelligent. *State v. Echols*, 382 S.W.3d 266, 280 (Tenn. 2012). To determine whether a defendant waived his rights voluntarily, knowingly, and intelligently, courts must look at the totality of the circumstances. *Id.* Relevant factors include:

> the age and background of the defendant; his education and intelligence level; his reading and writing skills; his demeanor and responsiveness to questions; his prior experience with the police; any mental disease or disorder; any intoxication at the time of the waiver; and the manner, detail, and language in which the *Miranda* rights were explained.

*Id.* at 280–81.

In evaluating whether a statement was given voluntarily, "the essential inquiry . . . is whether a suspect's will was overborne so as to render the confession a product of coercion." *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013) (citing *Dickerson v. United States*, 530 U.S. 428 ,433–35 (2000); *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996)). A suspect's subjective perception alone is insufficient to support a conclusion of involuntariness of a confession. *Smith*, 933 S.W.2d at 455 (citing *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994)). Rather, "coercive police activity is a necessary predicate to finding that a confession is not voluntary[.]" *Brimmer*, 876 S.W.2d at 79. The voluntariness of a confession is a question of fact. *State v. Sanders*, 452 S.W.3d 300, 306 (Tenn. 2014) (citing *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Morris*, 24 S.W.3d 788, 805 (Tenn. 2000); *Smith*, 933 S.W.2d at 455; *Self v. State*, 65 Tenn. 244, 253 (Tenn. 1873)). The State has the burden of proving the voluntariness of a confession by a preponderance of the evidence. *Id.* (citing *State v. Stamper*, 863 S.W.2d 404, 405 (Tenn. 1993)). A court determining voluntariness must examine the totality of the circumstances surrounding the giving of a confession, "both the characteristics of the accused and the details of the interrogation." *Climer*, 400 S.W.3d at 568 (quoting *Dickerson*, 530 U.S. at 434.

In *State v. Callahan*, our supreme court held that "juvenile waivers shall be analyzed under a totality-of-the-circumstances test" and that courts should consider the following factors:

> (1) consideration of all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;
>
> (2) the juvenile's capacity to understand the *Miranda* warnings and the consequences of the waiver;

- 37 -

(3) the juvenile's familiarity with *Miranda* warnings or the ability to read and write in the language used to give the warnings;

(4) any intoxication;

(5) any mental disease, disorder, or retardation; and

(6) the presence of a parent, guardian, or interested adult.

979 S.W.2d 577, 583 (Tenn. 1998). Our supreme court also stated that "[w]hile courts shall exercise special care in scrutinizing purported waivers by juvenile suspects, no single factor such as mental condition or education should by itself render a confession unconstitutional absent coercive police activity." *Id.* (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). More specifically, "the admissibility of a juvenile's confession is not dependent upon the presence of his parents at the interrogation." *State v. Carroll*, 36 S.W.3d 854, 864 (Tenn. Crim. App. 1999).

At the suppression hearing, Chief Detective Linzy testified that he attempted to contact the Defendant's family members by telephone and requested that the Bowling Green Police Department "basically go by the Kentucky address, and they could not locate them." Chief Detective Linzy also stated that he contacted the juvenile court earlier that morning, and after learning the details of the situation, the juvenile court authorized the Sumner County Sheriff's Office to speak with the Defendant without a parent or guardian present. Chief Detective Linzy agreed that the Defendant's speech and manner of speaking were odd, which caused him to question the Defendant's mental health "a little bit." However, before interviewing the Defendant, Chief Detective Linzy "went through each *Miranda* warning one by one[,]" and "[he] basically tried to break it down in the simplest terms [he] could for [the Defendant], and [he] reminded [the Defendant] over and over [again] of these rights." After the Defendant stated that he was willing to speak with the detectives, Chief Detective Linzy asked the Defendant to read the admonition and waiver of rights form and also asked the Defendant to read the form out loud to ensure that the Defendant could read and comprehend the information.

The trial court examined *Callahan*, and made the following conclusions: (1) the circumstances surrounding the Defendant's interrogation were not confrontational because the Defendant was not forced or coerced to waive his rights when considering his age, experience, education, and intelligence; (2) the Defendant was able to understand his *Miranda* rights and that he "was capable of knowing what he was doing when he waived his rights"; (3) the Defendant was familiar with his *Miranda* rights because the detectives informed him of his rights twice and he was able to read and write in English; (4) the

- 38 -

Defendant was not under the influence of any drug or alcohol that could have affected his ability to understand his *Miranda* right; (5) although the Defendant had mental health issues, "that was no factor in him waiving his *Miranda* rights here to talk to the police"; and (6) both of the Defendant's parents were deceased and Chief Detective Linzy made every effort possible to contact the Defendant's family members in Bowling Green, so there was "no constitutional violation or no statutory violation here because a parent or guardian or family was not contacted." As a result, the trial court denied the Defendant's motion to suppress.

The evidence supports the trial court's findings and conclusions. Chief Detective Linzy attempted to contact the Defendant's grandparents but when he was unsuccessful in reaching them, he obtained permission from the juvenile court to interview the Defendant. On the recording of the interview, the Defendant appeared calm and alert, and the detectives' manner of speaking was neutral and non-confrontational. Chief Detective Linzy ensured that the Defendant understood his rights under *Miranda* before questioning the Defendant by explaining the waiver of rights form to the Defendant and asking the Defendant to read the form to himself, as well as asking the Defendant to read portions of the form aloud to confirm that the Defendant could read. Chief Detective Linzy suspected that the Defendant had mental health issues based on his manner of speech and presentation, but the Defendant was able to answer the detectives' questions during the interview and he explained the facts of the offense as well as his actions after the offense to the detectives. The Defendant also declined to answer certain questions, which showed that he understood his right to remain silent. The Defendant denied consuming any illegal drugs or alcohol. We conclude that the trial court did not err in denying the Defendant's motion to suppress his statement to the Sumner County Sheriff's Office. *See Carroll*, 36 S.W.3d at 864-65 (affirming the denial of motion to suppress evidence against juvenile defendant when law enforcement unsuccessfully attempted to contact the defendant's family members and the defendant read and understood the waiver form). The Defendant is not entitled to relief on this ground.

### C. Denial of motion for mistrial

The Defendant argues that the trial court erred in denying his motion for mistrial after the Defendant testified on direct and cross-examination that his brother actually committed the offenses. The State asserts that the Defendant failed to establish that a mistrial was a manifest necessity and that the circumstances of the case weigh against granting a mistrial.

The decision of whether to grant a mistrial is within the sound discretion of the trial court. *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). Normally, a mistrial should be declared only in the event that a manifest necessity

requires such action.  *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did."  *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000).  The burden to show the necessity for a mistrial falls upon the party seeking the mistrial.  *Id.*  This court will not disturb the trial court's decision unless there is an abuse of discretion.  *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).  In evaluating whether the trial court abused its discretion, we may consider: "(1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof."  *State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007).

After the Defendant testified on direct and cross-examination that his brother committed the offenses and that he had been covering for his brother, trial counsel moved for a mistrial on the grounds that the Defendant's trial strategy was based on the Defendant's prior admissions that he committed the offenses and the argument that the Defendant did not have the requisite mens rea to be found guilty of premeditated first degree murder.  Trial counsel stated that the Defendant's testimony caused him to give the Defendant ineffective assistance of counsel because trial counsel would have challenged the DNA evidence and would not have "allowed a great deal of other evidence to be admitted without objection and without cross-examination had [he] known that was [the Defendant's] trial strategy."  The trial court found that trial counsel had properly represented the Defendant and noted that the Defendant chose to change his version of the offenses when he testified.  The trial court found that "[i]t would be a terrible precedent for a defendant to be able to take the witness stand and testify to something contrary to what he told the attorney and then have a mistrial."  The trial court denied the Defendant's motion for mistrial.

We conclude that the trial court did not abuse its discretion in denying the Defendant's motion for mistrial.  When the *Welcome* factors are applied to the case at hand, the evidence clearly weighs against declaring a mistrial.  First, the State did not elicit the testimony that was the basis for the Defendant's motion for mistrial.  On the contrary, the Defendant testified on direct examination that he did not commit the offenses and stated that it was the first time he had ever told anyone that information. The second factor, whether the trial court gave a curative instruction, is neutral because no one objected to the Defendant's testimony.  Lastly, the State's proof against the Defendant was strong; the Defendant's DNA was found on the handle of the sledgehammer that was used to hit his mother in the head, crushing her skull and brain. The Defendant also gave several written and verbal statements attesting to the fact that he killed his mother and set the residence on fire with the purpose of killing his brother. Therefore, the trial court did not abuse its discretion when it denied the Defendant's motion for mistrial.

Finally, the Defendant argues that the trial court's consecutive alignment of the Defendant's life sentence for his first degree murder conviction and his sentences of twenty years at thirty percent and 100% release eligibility for his attempted second degree murder and aggravated arson convictions, respectively, created a de facto sentence of life without parole, which violates the Defendant's Eighth Amendment right against cruel and unusual punishment. The State asserts that the Defendant's sentence is constitutional because the United State Supreme Court's precedents in *Miller v. Alabama*, 567 U.S. 460 (2012), and its progeny do not apply because the Defendant did not receive a mandatory sentence of life without parole. The State notes that "the *Miller* holding is specific to the statutory schemes of Arkansas and Alabama, wherein 'capital murder' was mandatorily punishable by death or life imprisonment without the possibility of parole" and contends that "Tennessee law gives the jury the discretion to consider the punishment of life imprisonment with the possibility of release[,]" citing to Tennessee Code Annotated section 39-13-204(a).

In *Miller*, the United States Supreme Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller*, 567 U.S. at 479. The Supreme Court specifically noted that, because its holding resolved the issues in the case, the Court "d[id] not consider [the defendants'] alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger." *Id.* In *Montgomery v. Louisiana*, the Supreme Court held that its rule in *Miller* was "a substantive rule of constitutional law" that required retroactive application. 136 S.Ct. 718, 736 (2016).

Tennessee courts that have followed *Miller* and its progeny have generally held that *Miller* does not apply to Tennessee's sentencing scheme because our sentencing act does not require that a juvenile receive a mandatory sentence of life without parole for capital murder. *See generally Charles Everett Lowe-Kelley v. State*, No. M2015-00138-CCA-R3-PC, 2016 WL 742180, at *8-9 (Tenn. Crim. App. Feb. 24, 2016), *perm. app. denied* (Tenn. June 23, 2016) (concluding that *Miller* is limited to mandatory life without parole sentencing schemes); *Kenneth A. Adams v. State*, No. W2014-02160-CCA-R3-PC, 2015 WL 5680228, at *2 (Tenn. Crim. App. Sept. 28, 2015), *perm. app. denied* (Tenn. Feb. 19, 2016) (concluding that *Miller* did not apply to the petitioner's case because he received a life sentence); *Billy L. Grooms v. State*, No. E2014-01228-CCA-R3-HC, 2015 WL 1396474, at *4 (Tenn. Crim. App. Mar. 25, 2015), *perm. app. denied* (Tenn. July 21, 2015) ("[S]entences that provide for the possibility of parole, even if the possibility will not arise before many years of incarceration, do not violate *Miller*."); *State v. Kayln*

*Marie Polochak*, No. M2013-02712-CCA-R3-CD, 2015 WL 226566, at *34 (Tenn. Crim. App. Jan. 16, 2015), *perm. app. denied* (Tenn. May 14, 2015) (concluding that *Miller* did not apply because the defendant received a life sentence); *Cyntoia Denise Brown v. State*, No. M2013-00825-CCA-R3-PC, 2014 WL 5780718, at *21 (Tenn. Crim. App. Nov. 6, 2014), *perm. app. denied* (Tenn. May 15, 2015) (concluding that *Miller* did not apply because the petitioner received a life sentence); *Floyd Lee Perry, Jr., v. State*, No. W2013-00901-CCA-R3-PC, 2014 WL 1377579, at *5 (Tenn. Crim. App. Apr. 7, 2014), *perm. app. denied* (Tenn. Sept. 18, 2014) ("We are not compelled to grant the petitioner's request to expand the meaning of the *Miller* holding."); *but see Jacob Brown v. State*, No. W2015-00887-CCA-R3-PC, 2016 WL 1562981, at *5-7 (Tenn. Crim. App. Apr. 15, 2016), *perm. app. denied* (Tenn. Aug. 19, 2016) (concluding that juvenile defendant's two consecutive sentences of life without parole violated the Eighth Amendment).

Here, the Defendant received a life sentence for his conviction of first degree premeditated murder. Because the Defendant did not receive a mandatory sentence of life without parole, we conclude that *Miller* and its progeny do not apply to the Defendant's case, and the trial court did not err in ordering an effective sentence of life plus twenty years. He is not entitled to relief on this ground.

## III. Conclusion

For the aforementioned reasons, we conclude that the trial court did not err in denying the Defendant's motions to be declared incompetent, motion to suppress the Defendant's statement, or the motion for mistrial and did not err in sentencing the Defendant to life plus twenty years. The judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE